IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JOHN C. CREUZOT,<br>　　Plaintiff,<br><br>v.<br><br>ALVIN GREEN<br>　　Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§ | Civil No. 3:17-CV-0404-M-BK |

**FINDINGS, CONCLUSION, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to the Chief Judge Lynn's *Standing Order of Reference*, Doc. 19, this case was referred to the undersigned United States magistrate judge for proceedings consistent with the authority conferred by 28 U.S.C. § 636. Came on to be heard Plaintiff's *Application for Preliminary Injunction*, Doc. 6. Upon review of the pleadings, applicable law, and the evidence and argument presented at the hearing on the same, and for the reasons that follow, it is recommended that Plaintiff's application be **GRANTED**.

**I. BACKGROUND AND PROCEDURAL HISTORY**

On February 22, 2017, Plaintiff John C. Creuzot filed his Verified Amended Complaint and Application for Preliminary Injunction, alleging a violation of the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 8131, stemming from Defendant's registration of three domain names: <johncreuzotforda.com>; <creuzotforda.com>; and <creuzot2018.com> (collectively "the Domain Names").[1] Doc. 6. Defendant Alvin Green, proceeding without the assistance of legal counsel, filed a timely answer, in which he denies Plaintiff's allegations and specifically asserts that the

---

[1] The symbols "< >" are not actually part of the domain names listed herein, but are used to prevent the insertion of live hyperlinks throughout this document.

domain names are not protected by the ACPA and that he never offered to sell them to Plaintiff. Doc. 14. On May 15, 2017, an evidentiary hearing was held, at which Plaintiff and Defendant each testified and presented documentary evidence.[2]

Plaintiff alleges that in December 2016, he began publicly announcing his intention to run for Dallas County District Attorney in 2018. Doc. 6 at 2. Plaintiff and Defendant agree that the same month, while Defendant was visiting Plaintiff at his office, Defendant strongly encouraged Plaintiff to drop out of the race, opining that Plaintiff could not win. Doc. 6 at 2-3 & Doc. 14 at 9. Defendant avers, *inter alia*, that this was because Plaintiff, who previously had been appointed and successfully run for judge as a Democrat, had also been elected to that position as a Republican, and now planned to run for D.A. as a Democrat. Doc. 17 at 1. However, Plaintiff alleges that Defendant advised him that he was supporting a different candidate for the Democratic nomination in the D.A's race. Doc. 6 at 2. Regardless of Defendant's motive for telling Plaintiff not to run, the parties agree that Plaintiff refused the advice and, shortly thereafter, Defendant, unbeknownst to Plaintiff, registered the Domain Names.[3] Doc. 6-1 at 2-6 & Doc. 14 at 2.

When Plaintiff discovered this fact, the parties met on February 6, 2017, and Plaintiff offered to purchase the Domain Names for Defendant's out-of-pocket expenses

---

[2] Plaintiff offered two exhibits: a binder containing most of the parties' pleadings filed in this case and a screenshot from <creuzot.com> taken March 3, 2017. Defendant offered three exhibits: screenshots from <bluecountynews.com> taken May 12, 2017, and two emails sent between Defendant and Plaintiff's counsel. It should be noted that at the time this lawsuit was filed, traffic to the Domain Names was redirected to <creuzot.com>, as depicted in Plaintiff's exhibit. However, as of the date of the hearing, traffic to the Domain Names was redirected to <bluecountynews.com>, as depicted in Defendant's exhibit. An internet search also reveals that content has been periodically added to <bluecountynews.com> while this matter has been pending.

[3] Defendant registered <creuzotforda.com> and <creuzot2018.com> on January 7, 2017, and <johncreuzotforda.com> on February 6, 2017. Doc. 6-1 at 2-6.

– $11.99 to register each of the Domain Names. Doc. 6 at 3 & Doc. 17 at 4. Defendant declined, and Plaintiff initiated this action seven days later. Doc. 6 at 3 & Doc. 17 at 4; *see* Doc. 1. According to Plaintiff's testimony, Defendant dismissed the offer as being too little; however, Defendant testified that he declined the offer because he had plans for the Domain Names and was shocked to learn that this lawsuit had been filed within a few days of that conversation.

The parties' testimony was largely consistent with the factual averments in their respective pleadings. Of particular relevance, both parties testified that after the conversation in which Defendant refused Plaintiff's offer to purchase the Domain Names and this lawsuit was filed, Defendant sent Plaintiff and Plaintiff's counsel a total of three email offers in March 2017, in which he offered to conclude the lawsuit and return the Domain Names to Plaintiff: the first for $10,150; then $5,000; and finally $2,500. While Defendant contends that the offers were proper offers to settle and compromise this legal action, Plaintiff contends that Defendant's offers were attempts to sell the Domain Names at inflated costs, couched in terms of a legal settlement, as evidenced by the improper requests for legal fees, even after Defendant was informed that proceeding *pro se*, he was not entitled to recoup them.

## II. LEGAL STANDARD

The decision to grant or deny a preliminary injunction lies within the sound discretion of the district court. *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). Still, a preliminary injunction is an "extraordinary and drastic remedy," granted "only when the movant, by a clear showing, carries the burden of persuasion." *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir.

1985) (citation omitted). To obtain a preliminary injunction, the movant must establish each of the following: (1) a substantial likelihood that the movant will prevail on the merits; (2) a substantial threat that the movant will suffer irreparable harm if the injunction is not granted; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that granting the preliminary injunction will not disserve the public interest. *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987).

### III. ANALYSIS

**A.    Success on the Merits**

To establish liability under the ACPA, Plaintiff must prove that Defendant (1) registered a domain name; (2) consisting of the name of another living person, or a name "substantially and confusingly similar" thereto; (3) without that person's consent; (4) with the specific intent to profit from such name by selling the domain name for financial gain to that person or any third party. 15 U.S.C. § 8131(1)(A).[4] However, an individual will not be liable under section 8131 where they register a domain in good faith and the name is

> used in, affiliated with, or related to a work of authorship protected under Title 17 . . . and if the person registering the domain name is the copyright owner or licensee of the work, the person intends to sell the domain name in conjunction with the lawful exploitation of the work, and such registration is not prohibited by a contract between the registrant and the named person.

15 U.S.C. § 8131(1)(B). Defendant does not argue that the exception at subsection (1)(B) applies and admits that he registered the Domain Names without Plaintiff's consent.

---

[4] Section 8131 was previously codified under 15 U.S.C. § 1129, which several of the cases cited herein refer to.

Doc. 14 at 3 (admitting the allegation in Plaintiff's complaint that Defendant registered the Domain Names without Plaintiff's consent); *see* Doc. 6 at 3. The Court, therefore, need only determine at this stage whether (1) the Domain Names consist of Plaintiff's name or a name "substantially and confusingly similar" thereto; and (2) Defendant registered the Domain Names with the specific intent to profit.

### i. Whether the Domain Names consist of Plaintiff's name, or a name "substantially and confusingly similar" thereto.

Plaintiff argues that this requirement is satisfied because the Domain Names "include one or more of Plaintiff's personal names." Doc. 6 at 6. In response, Defendant contends, *inter alia*, that section 8131 applies only to domain names composed of an individual's exact full name, *e.g.*, <johncreuzot.com>. Doc. 14 at 8. Therefore, because Plaintiff's name is not "John Creuzot for DA," "Creuzot for DA," or "Creuzot 2018," the Domain Names do not trigger section 8131 liability. Doc. 14 at 8.

The majority of courts do not read section 8131 as narrowly as Defendant, applying the statute to domain names composed entirely of an individual's (1) first and last names plus descriptive words[5]; (2) last name[6]; and (3) last name plus descriptive

---

[5] *See Randazza v. Cox*, 920 F.Supp.2d 1151, 1154 (D. Nev. 2013) ("<trollmarcrandazza.com>," "<marcrandazzaegomaniac.com>," and "<marcrandazzaviolatedmylegalrights.com>"); *Hooper v. Kelley*, No. SACV 13-0165 AG, 2013 WL 12064272, at *3 (C.D. Cal. May 2, 2013) ("<grahamhoopersunsetbeach.com>" and "<graham-hooper-sunset-beach.com>"); *Maus v. Ennis*, No. 10-CV-1904-Orl-31DAB, 2012 WL 1252677, at *9 (M.D. Fla. Mar. 16, 2012) ("<davidmauscardealer.info>," "<davidmausfoundation.info>," and "<davidmaussucks.info>").

[6] *See, e.g.*, *Misterovich v. Burggraf*, No. 13-CV-1221, 2014 WL 7010801, at *2-3 (W.D. Mich. Dec. 10, 2014) ("<misterovich.com>"); *Schmidheiny v. Weber*, 285 F.Supp.2d 613, 627-28 (E.D. Pa. 2003) ("<schmidheiny.com>").

words.[7] In fact, the Court's research has revealed only one opinion suggesting that section 8131 applies only to domain names that consist of an individual's exact first and last name, or a name substantially and confusingly similar to an individual's full name with nothing more included.[8]

Indeed, there would be no need to include in the statute the qualifier "substantially and confusingly similar thereto" if only the exact, full name of an individual is subject to its protections. In this case, Defendant confirmed by his testimony that the purpose of obtaining the particular Domain Names was to capture the internet traffic of those users searching for information about Plaintiff's bid for the D.A.'s office – all but admitting that the Domain Names are "substantially and confusingly similar" to Plaintiff's actual name.

Finally, the restrictive reading Defendant suggests appears at odds with the legislative history of section 8131. *See* 145 Cong. Rec. S14696, S14715, 1999 WL 1041313 (Nov. 17, 1999) (section-by-section analysis) ("[Section 8131] is broad enough to apply to the registration of full names (e.g., johndoe.com), appellations (e.g., doe.com), and variations thereon (e.g., john-doe.com or jondoe.com)[.]"). In fact, the application of section 8131 to campaign websites similar to those at issue here was envisioned by Senator Patrick Leahy, the bill's co-sponsor. *See* 145 Cong. Rec. S14986, S15026, 1999

---

[7] *See Maus*, 2012 WL 1252677 ("<mausmediagroup.info>"); *Randazza*, 920 F.Supp.2d 1151 ("<randazzalegalgroupsucks.com>").
[8] *See Philbrick v. eNom, Inc.*, 593 F.Supp.2d 352, 379 (D. N.H. 2009) (finding the name "Daniel Philbrick" was not (1) substantially similar to the domain name <philbricksports.com>, as it omitted "Daniel" and included the word "sports;" or (2) confusingly similar to the domain name <philbricksports.com>, as "even the most careless viewer would not mistake the word 'philbricksports' for the words 'Daniel Philbrick'").

WL 1050353 (Nov. 19, 1999) (statement of Sen. Leahy noting that section 8131 "addresses [the] problem" of "Senators and presidential hopefuls . . . finding that domain names like bush2000.org and hatch2000.org are . . . snatched up by cyber poachers intent on reselling these domain names for a tidy profit").

The undersigned thus finds that the Domain Names, which contain of one or both of Plaintiff's names and "for DA" and "2018," consist of Plaintiff's name, or a name substantially and confusingly similar thereto, and therefore, come within the parameters of 15 U.S.C. § 8131(1)(A).

### ii. Whether Defendant had the specific intent to profit.

Plaintiff argues that Defendant's intent to profit is evidenced by his refusal to sell the Domain Names at cost, his demand for payment beyond the Domain Names' actual cost, and his previous cybersquatting behavior. Doc. 6 at 6. Specifically, Plaintiff notes that in 2009, an arbitration panel found that Defendant "registered domain names in bad faith without any rights or legitimate interests in the domain names." Doc. 6 at 6 & Doc. 6-4 at 6.

In response, Defendant argues that there is "no evidence or indication" that he registered the Domain Names with the intent to profit, and that the website the Domain Names redirect to, now <bluecountynews.com>, was created to promote political speech. Doc. 14 at 9. In reply, Plaintiff rejects the notion that the Domain Names are being used for political speech, arguing that Defendant is attempting to extort him, a scheme evidenced by Defendant's registration of 520 domain names, several of which consist of the names of other Dallas professionals and political figures. Doc. 15 at 8-9.

7

"There is a dearth of authority regarding what constitutes 'a specific intent to profit'" under section 8131. *Zinner v. Olenych*, 108 F.Supp.3d 369, 393 (E.D. Va. 2015) (collecting cases) (footnote omitted). To aid this inquiry, courts have applied the elements of a related cyberpiracy statute, 15 U.S.C. § 1125, which requires "a bad faith intent to profit" from the registration of a domain name that is identical to or confusingly similar to a registered trademark. *Id.* at § 1125(d)(1)(A)(i); *see Randazza*, 920 F.Supp.2d at 1157 (considering the section 1125 factors when determining whether defendants had a specific intent to profit under section 8131); *Bogoni v. Gomez*, 847 F.Supp.2d 519, 524 (S.D. N.Y. 2012) (finding the section 1125 factors "helpful" to the specific-intent-to-profit analysis under section 8131, as the statutes are both part of the ACPA and are "strikingly similar"). These factors include – as relevant here – (1) whether the domain names consist of the registrant's legal name; (2) the registrant's offers to sell the domain names to the mark owner without having used the domain name in the bona fide offering of any goods and services; (3) the registrant's past similar behavior; and (4) the registrant's "acquisition of multiple domain names" related to the mark. *See* 15 U.S.C. § 1125(d)(1)(B).

Upon review of all of the relevant evidence, the Court finds that Defendant registered the Domain Names with the intent to profit. Defendant testified at the hearing that his business essentially amounts to buying potentially desirable domain names and selling/leasing them to individuals, businesses, etc. for a profit. In fact, Defendant stated that his business is "just like" the domain name registrar <GoDaddy.com>. Furthermore, of the 520 domain names Defendant has registered, the overwhelming majority have no content. Moreover, as Plaintiff correctly notes, it is a matter of public record that

8

Defendant has unsuccessfully defended against a previous charge of cybersquatting. *See* Doc. 6-4 (arbitrator's decision that Defendant/Defendant's wife registered domain names confusingly similar to a trademarked name without any right or interest in the domain names); *Green, et al v. The Neiman Marcus Group, Inc.*, 3:09-CV-598-O (Defendant's lawsuit appealing arbitrator's decision, subsequently stayed then dismissed).

In this instance, the circumstances of Defendant's registration of the Domain Names strongly suggest a profit motive as well: (1) unbeknownst to Plaintiff, Defendant registered four domain names that include all or part of Plaintiff's name shortly after Plaintiff told Defendant about his candidacy, Doc. 6 at 2-3 & Doc. 14 at 9; (2) Defendant refused to sell the Domain Names at cost, Doc. 6 at 2-3 & Doc. 14 at 9, but left open the door to further discussion; and (3) after being surprised that Plaintiff quickly filed this suit, Defendant offered to end the dispute and return the Domain Names to Plaintiff, provided that Plaintiff accede to his demand of $10,150, then $5,000, and finally $2,500.

Defendant testified that the amounts sought were meant to compensate him for his time spent working on this case, and not for the sale of the Domain Names. The Court finds Defendant's testimony incredible and his argument unconvincing in light of the fact that (1) the proposed settlement amounts diminished rather than increased over time with the effort Defendant ostensibly expended, and (2) Defendant is *pro se* and not an attorney and, thus, is not entitled to attorney's fees. Instead, these communications amount to a clear offer to exchange the Domain Names for an amount far beyond their actual cost – the type of *quid pro quo* offer indicative of a specific intent to profit. *See Bogoni*, 847 F.Supp.2d at 525 (finding defendant's offer to sell the domain names for a price "exorbitantly beyond" their actual value "strongly probative of a specific intent to

profit"); *Schmidheiny*, 285 F.Supp.2d at 627 (finding intent to profit "established by defendants' e-mails to the plaintiff offering to sell the domain name for $1.1 million"); *Hooper*, 2013 WL 12064272, at *2 (finding intent to profit where defendant "on numerous occasions demanded money from Plaintiff in exchange for control of the domain names").[9] The Court further finds implausible Defendant's testimony that his purchase of the Domain Names was motivated solely by his desire to exercise his right to engage in political speech, when Defendant does not dispute that he left open the possibility of making a deal for the Domain Names with Plaintiff at the February 6, 2017, but had not anticipated that Plaintiff would file this lawsuit.

The specific-intent-to-profit inquiry under section 8131 is "context-based." *Tollefson v. Pladson*, No. 11-CV-62, 2012 WL 3402107, at *4 (D. N.D. May 9, 2012). In light of Defendant's past similar action and the circumstances surrounding his registration of the Domain Names, Plaintiff can likely establish that Defendant registered the Domain Names with the specific intent to profit. *See Randazza*, 920 F.Supp.2d at 1157 ("Defendants' actions leading up to the filing of the Complaint, as well as Defendants' past behavior . . . clearly seems to indicate cyber-extortion."). Accordingly, Plaintiff is likely to succeed on the merits of his section 8131 claim.

---

[9] That these offers were made in March – approximately two months after the Domain Names were registered – does not indicate that Defendant lacked the specific intent to profit when he registered the Domain Names. *Cf. Schmidheiny*, 285 F.Supp.2d at 628 (finding a lapse of approximately five months between defendant registering domain names and offering them for sale was "relatively brief," and holding that plaintiff was entitled to summary judgment on the issue of specific intent to profit).

**B.      Irreparable Harm**

Plaintiff argues that irreparable harm is presumed because he has established a likelihood of success on the merits. Doc. 6 at 7. Additionally, Plaintiff argues that if an injunction is not granted, Defendant will continue to use the Domain Names to confuse potential voters and threaten Plaintiff's reputation and goodwill. Doc. 6 at 7-8.

Defendant contends that Plaintiff has not shown a substantial threat of irreparable harm. Doc. 17 at 3. At the hearing, Plaintiff testified that Defendant's use of the Domain Names has forced him to come up with a campaign theme that does not incorporate his name: <hardworkheartwork.com>. Additionally, because of Defendant's actions Plaintiff stated that he is unable to tie the Domain Names to this theme. Defendant primarily testified that Plaintiff is not harmed because there are an infinite number of domain names containing Plaintiff's name that are still available.

"[A] harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011) (citations omitted). In the two cases revealed by the Court's research that have examined a section 8131 claim in the context of a preliminary injunction, both found irreparable harm likely where a defendant linked domain names containing the plaintiff's name to content unendorsed by or unaffiliated with the plaintiff. *See Hooper*, 2013 WL 12064272, at *2 (finding likelihood of irreparable harm where defendant "link[ed] domain names containing Plaintiff's name to content that Plaintiff [did] not endorse or control"); *Bogoni*, 840 F.Supp.2d at 702 (finding likelihood of irreparable harm where defendant's use of the plaintiff's name in domain names created a "likelihood of confusion as to the source, sponsorship, affiliation and endorsement of those sites").

Here, just as in *Hooper* and *Bogoni*, the Domain Names, which consist of Plaintiff's name in various iterations and which would naturally be associated with his campaign for office, are being linked to content unaffiliated with, unendorsed by, and uncontrolled by Plaintiff. Furthermore, Plaintiff's electoral prospects are likely to suffer absent an injunction. As Plaintiff testified, Defendant's use of the Domain Names has prevented him from tying his name to his campaign in the manner he wishes. Plaintiff's inability to use his name as desired will likely harm his election efforts, considering that political candidates rely heavily on their names for marketing and get-out-the-vote efforts. Relatedly, Defendant's use of the Domain Names will likely prevent individuals from locating Plaintiff's campaign website because it redirects individuals to <bluecountynews.com> (as Defendant testified is his intention in utilizing the Domain Names), further harming Plaintiff's ability to effectively campaign. Such injury to Plaintiff's electoral prospects would be difficult to quantify or remedy through damages. *Janvey*, 647 F.3d at 600.

### C. Balance of Hardships and Public Interest

The balance of hardships weighs in favor of Plaintiff, who, without an injunction, will be unable to use his own name as he desires to publicize his candidacy, or properly control the content to which his name is attached. Any hardship suffered by Defendant would be minimal by comparison. After all, the proposed injunction does not require that Defendant remove or alter content appearing on <www.bluecountynews.com>, it simply prevents Defendant from registering and using domain names that tie Plaintiff's name to that content. *See Randazza*, 920 F.Supp.2d at 1158 (finding that defendants suffered minimal harm from an injunction where they remained free to register domain names that

12

did not incorporate the plaintiff's names); *Hooper*, 2013 WL 12064272, at *2 (finding that defendant suffered minimal harm from an injunction where she was still be able to register domain names that did not incorporate the plaintiff's name and post content she desired).

Furthermore, entry of a preliminary injunction would serve the public interest. As explained above, an injunction would prevent confusion regarding Plaintiff's endorsement of the content posted using his name, as reflected in the Domain Names, enable Plaintiff to control the use of his name, and ensure that the electorate are able to effectively access Plaintiff's content, all while leaving Defendant's right to free speech unimpeded. *See Hooper*, 2013 WL 12064272, at *2 (the public interest is served "in avoiding confusion as to the endorsement and control of online information without impermissibly affecting the right to free speech"); *Randazza*, 920 F.Supp.2d at 1158 (finding that injunctive relief did not disserve the public interest where the defendant was free to publish her opinions on other websites).

In sum, Plaintiff has established (1) that he is likely to succeed on the merits of his section 8131 claim; (2) a substantial threat that he will suffer irreparable harm if the injunction is not granted; (3) that the threatened injury to Plaintiff outweighs whatever damage the proposed injunction may cause Defendant; and (4) that granting the preliminary injunction will not disserve the public interest. Accordingly, Plaintiff's request for preliminary injunction should be granted.

## IV. BOND

The party moving for a preliminary injunction must give "security in an amount that the court considers proper to pay the costs and damages sustained by any party found

to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). The amount of that security "is a matter for the discretion of the trial court." *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (quoting *Corrigan Dispatch Co. v. Casa Guzman, S. A.*, 569 F.2d 300, 303 (5th Cir. 1978)). Plaintiff contends that a reasonable bond in this case is $35.97, the combined value of the Domain Names (each valued at $11.99). Doc. 6 at 3. Defendant does not argue or present evidence suggesting that this amount is inadequate. The Court further finds, however, that entry of the injunction requested would also prevent Defendant from using another domain name he has registered, <creuzot.com>, which presumably has the same individual value as the Domain Names. Thus, the Court finds that a reasonable security is $47.96.

## V. CONCLUSION

Thus, for the reasons discussed herein, it is recommended that Plaintiff's *Application for Preliminary Injunction*, Doc. 6, be **GRANTED**.

**IT IS RECOMMENDED** that any other relief sought by the application for preliminary injunction that is not expressly granted be **DENIED**.

**IT IS RECOMMENDED** that Defendant Alvin Green and any persons acting in concert with him be **ENJOINED** from using any domain name registered by Defendant that consists of Plaintiff's name, or any name substantially or confusingly similar thereto, pending a determination on the merits of Plaintiff's claim or further order of the Court.

**IT IS RECOMMENDED** that Defendant Alvin Green and any persons acting in concert with him be specifically **ENJOINED** from using the domain names <johncreuzotforda.com>; <creuzotforda.com>; <creuzot2018.com>; and <creuzot.com>.

**IT IS RECOMMENDED** that Defendant Alvin Green and any persons acting in concert with him be **ENJOINED** from registering additional domain names consisting of Plaintiff's name, or any name substantially and confusingly similar thereto, pending a determination on the merits of Plaintiff's claim or further order of the Court.

**IT IS RECOMMENDED** that Plaintiff be required to post a security bond of $47.96.

**IT IS RECOMMENDED** that the preliminary injunction remain in effect until 11:59 p.m., March 31, 2018, or until the trial of Plaintiff's permanent injunction request for relief, whichever is later, unless otherwise ordered by the Court.

**SO RECOMMENDED** on May 23, 2017.

_____
RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND
NOTICE OF RIGHT TO APPEAL/OBJECT**

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

*[signature]*

RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE